NO. 15-3225

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

MICHAEL J. BELLEAU,

PLAINTIFF-APPELLEE,

V.

EDWARD F. WALL, and DENISE SYMDON,

DEFENDANTS-APPELLANTS.

On Appeal from the United States District Court
for the Eastern District of Wisconsin
Case No. 1:12-cv-01198-WCG
The Honorable William C. Griesbach, Chief District Court Judge

BRIEF *AMICUS CURIAE*
OF ELECTRONIC FRONTIER FOUNDATION
IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

Adam Schwartz
Jennifer Lynch
Jamie Lee Williams
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Facsimile: (415) 436-9993
adam@eff.org

Attorneys for *Amicus Curiae*

## RULE 26.1 DISCLOSURE STATEMENT

*Amicus curiae* the Electronic Frontier Foundation is a non-profit public advocacy organization. *Amicus curiae* has not appeared earlier in this case and no attorney from any other organization or law firm has appeared, or is expected to appear, on behalf of *amicus curiae* in this case.

*Amicus curiae* states that it does not have a parent company, subsidiary or affiliate, and does not issue shares to the public.

Dated: December 18, 2015    By: /s/ Adam Schwartz

Adam Schwartz
ELECTRONIC FRONTIER
FOUNDATION

Counsel of Record for *Amicus Curiae* pursuant to Circuit Rule 3(d)

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................. 1

ARGUMENT .......................................................................................... 2

I.   Wisconsin's GPS Tracking Program Constitutes an Unreasonable Search Under the Fourth Amendment.............. 4

   A.   Wisconsin's GPS Surveillance Program—Which Imposes Highly Precise, Minute-by-Minute Location Tracking on All Registrants—Severely Burdens Privacy............................................................................. 6

      1.   GPS Tracking Devices are Highly Precise ............ 6

      2.   The Implementation of Wisconsin's Program Increases its Impact on Privacy ............................. 9

   B.   The Privacy Interests of Persons Who Have Fully Served Their Sentences Sharply Outweigh the State's Interest in Preventing Recidivism ................. 11

      1.   The Fourth Amendment Protects Location Privacy .................................................................. 11

      2.   Research Shows Americans Have a Subjective Expectation of Privacy in Their Location Information ........................................................... 12

      3.   A Growing Number of States Protect Location Information by Statute......................................... 14

      4.   Courts Recognize the Privacy Implications of Location Information............................................ 17

      5.   The Challenged GPS Program is More Onerous Than Other Forms of Location Monitoring Previously Addressed by the Courts.................... 21

C.      Wisconsin's Program is Not Justified by a "Special Need" Beyond the Ordinary Needs of Law Enforcement ................................................................. 23

II.     GPS Surveillance Also Burdens Speech and Association…...26

III.    Wisconsin's Surveillance Program Constitutes Retroactive Punishment and Thus Violates the Ex Post Facto Clause ... 28

IV.     Fourth Amendment Guarantees Must be Maintained as New Technologies Make New Surveillance Possible ............ 30

CONCLUSION ........................................................ 34

CERTIFICATE OF COMPLIANCE ....................................... 35

CERTIFICATE OF SERVICE .............................................. 36

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Gant*,
   556 U.S. 332 (2009) .............................................................. 5

*Bond v. United States*,
   529 U.S. 334 (2000) ............................................................ 12

*Brown v. Socialist Workers*,
   459 U.S. 87 (1982) ........................................................ 26, 27

*Camara v. Municipal Court of San Francisco*,
   387 U.S. 523 (1967) .......................................................... 25

*Chandler v. Miller*,
   520 U.S. 305 (1997) .......................................................... 24

*City of Indianapolis v. Edmond*,
   531 U.S. 32 (2000) ............................................................ 25

*Commonwealth v. Augustine*,
   4 N.E.3d 846 (Mass. 2014) ........................................... 19, 20

*Commonwealth v. Cory*,
   911 N.E.2d 187 (Mass. 2009) ............................................ 29

*Commonwealth v. Melilli*,
   555 A.2d 1254 (Pa. 1989) .................................................. 21

*Commonwealth v. Rushing*,
   71 A.3d 939 (Pa. Super. Ct. 2013)...................................... 21

*Coolidge v. New Hampshire*,
   403 U.S. 443 (1971) ............................................................ 5

*Delaware v. Prouse*,
   440 U.S. 648 (1979) .......................................................... 25

*Doe v. Bredesen*,
   507 F.3d 998 (6th Cir. 2007) ............................................. 30

*Ellis v. State,*
    353 S.E.2 19 (Ga. 1987)........................................................... 21

*Florida v. Jardines,*
    133 S. Ct. 1409 (2013) ........................................................... 22

*Grady v. North Carolina,*
    135 S. Ct. 1368 (2015) ...................................................... 5, 24

*In re Application for Cell Site Data,*
    724 F.3d 600 (5th Cir. 2013) ............................................... 20

*In re Application for Tel. Info.,*
    2015 WL 4594558, *12 (N.D. Cal. 2015), *appeal filed,* No. 15-16760
    (9th Cir. 2015)...................................................................... 20

*In re application relating to target phone,*
    733 F. Supp. 2d 939 (N.D. Ill. 2009) .................................. 21

*Katz v. United States,*
    389 U.S. 347 (1967) ............................................................. 12

*Kyllo v. United States,*
    533 U.S. 27 (2001) .......................................................... 11, 22

*NAACP v. Alabama,*
    357 U.S. 449 (1958) ........................................................ 26, 27

*Nat'l Treasury Emps. Union v. Von Raab,*
    489 U.S. 656 (1989) ............................................................. 24

*People v. Blair,*
    602 P.2d 738 (Cal. 1979) ..................................................... 21

*People v. Sporleder,*
    666 P.2d 135 (Colo. 1983)..................................................... 21

*Riley v. California,*
    134 S. Ct. 2473 (2014) ................................................ 2, 19, 22

*Riley v. New Jersey Parole Bd.,*
    98 A.3d 544 (N.J. 2014) ................................................. 29, 30

*Rise v. Oregon,*
   59 F.3d 1556 (9th Cir. 1995) .............................................................. 33

*Roberts v. Jaycees,*
   468 U.S. 609 (1984) ................................................................... 27, 28

*Samson v. California,*
   547 U.S. 843 (2006) ........................................................................ 25

*Schneckloth v. Bustamonte,*
   412 U.S. 218 (1973) .......................................................................... 5

*Shaktman v. State,*
   553 So.2d 148 (Fla. 1989) ............................................................... 21

*Smith v. Doe,*
   538 U.S. 84 (2003) ................................................................ 28, 29, 30

*State v. Bowditch,*
   700 S.E.2d 1 (N.C. 2010) ................................................................ 30

*State v. Dykes,*
   744 S.E.2d 505 (S.C. 2013) ............................................................. 29

*State v. Earls,*
   70 A. 3d 630 (N.J. 2013) ................................................................. 20

*State v. Gunwall,*
   720 P.2d (Wash. 1986) .................................................................... 21

*State v. Hunt,*
   450 A.2d 952 (N.J. 1982) ................................................................ 21

*State v. Rothman,*
   779 P.2d 1 (Haw. 1989) .................................................................. 21

*State v. Thompson,*
   760 P.2d 1162 (Idaho 1988) ............................................................ 21

*Tracey v. State,*
   152 So.3d 504 (Fla. 2014) ............................................................... 20

*United States v. Cooper*,
 2015 WL 881578, *8 (N.D. Cal. 2015) .......................................... 15, 20

*United States v. Cuevas-Perez*,
 640 F.3d 272 (7th Cir. 2011), *vacated*, 132 S. Ct. 1534 (2012)....... 3, 27

*United States v. Davis*,
 785 F.3d 498 (11th Cir. 2015) (en banc), *cert. denied*, 2015 WL
 4600402 (2015)................................................................................ 20

*United States v. Graham*,
 796 F.3d 332 (4th Cir. 2015), *rehearing en banc granted*, 2015 WL
 6531272 (2015)................................................................................ 20

*United States v. Jones*,
 132 S. Ct. 945 (2012) ............................................................ *passim*

*United States v. Karo*,
 468 U.S. 705 (1984) ........................................................................ 22

*United States v. Knotts,*
 460 U.S. 276 (1983) ........................................................................ 20

*United States v. Maynard*,
 615 F.3d 544 (D.C. Cir. 2010) .................................................... 11, 14

*United States v. Powell*,
 943 F. Supp. 2d 759 (E.D. Mich. 2013)............................................ 21

*United States v. White*,
 62 F. Supp. 3d 614 (E.D. Mich. 2014)............................................. 20

*Vernonia Sch. v. Acton*,
 515 U.S. 646 (1995) .................................................................. 24, 25

*Weaver v. Graham*,
 450 U.S. 24 (1981) .......................................................................... 28

# Statutes

16 Maine Rev. Stat. Ann. § 648 .................................................................. 17

18 Pa. Stat. Ann. § 5761(c)(4) ................................................................... 17

725 Ill. Comp. Stat. Ann. 168/10............................................................... 15

Cal. Penal Code § 637.7............................................................................. 17

Cal. Penal Code Ann. § 1546...................................................................... 17

Colo. Rev. Stat. Ann. § 16-3-303.5 ............................................................. 17

Del. Code Ann. § 1335(a)(8) ...................................................................... 17

Fla. Stat. Ann. § 934.42.............................................................................. 17

Haw. Rev. Stat. § 803-42(a)(8) ................................................................... 17

Haw. Rev. Stat. § 803-44.7(b) .................................................................... 17

Ind. Code Ann. § 35-33-5-12...................................................................... 15

Iowa Code Ann. § 808.4 ............................................................................. 17

Md. Code, Criminal Procedure 1-203.1(b)(1) ........................................... 16

Minn. Stat. Ann. § 626A.35........................................................................ 17

Minn. Stat. Ann. §§ 626A.28(3)(d), 626A.42(1)(d).................................... 17

Mont. Code Ann. § 46-5-110(1)(a) ............................................................. 17

N.H. Stat. Ann. § 644-A ............................................................................. 17

Okla. Stat. Ann. Title 13, § 177.6(A) ......................................................... 17

S.C. Code Ann. § 17-30-140(B)(2) .............................................................. 17

Tenn. Code Ann. § 39-13-606 ..................................................................... 17

Tenn. Code Ann. § 39-13-610(b).................................................................. 17

Tex. Penal Code Ann. § 16.06 ................................................ 17

Utah Code Ann. § 77-23c-102(1)(a) ....................................... 17

Va. Code § 18.2-60.5 ............................................................ 17

Va. Code Ann. 19.2-56.2(b) ................................................... 16

Wash. Rev. Code 9.73.260 ..................................................... 16

Wis. Stat. Ann. § 813.129 ...................................................... 32

Wis. Stat. Ann. § 968.373(2) ................................................. 15

## Other Authorities

Ariana Green, *More States Use GPS To Track Abusers*, N.Y. Times
(May 8, 2009) ..................................................................... 33

*Assisted GPS: How Your Phone Knows Where It Is*, PC
World (Oct. 16, 2012) .......................................................... 7

BI Incorporated, website .................................................. 8, 10

Domestic Shelters, *Using GPS To Track Batterers* (July 15, 2015) ..... 32

Eric Dante, *Tracking the Constitution: The Proliferation and Legality of
Sex-offender GPS-tracking Statutes*, 42 Seton Hall L. Rev. 1169,
1172-1190 (2012) ................................................................ 32

FAA, *GPS Performance Analysis Report* (July 31, 2014) ..................... 7

Governor's Office of Crime Control and Prevention, *Maryland's
Comprehensive State Crime Control and Prevention Plan* (2013) ..... 32

Illinois General Assembly, 98th General Assembly, legislative history
of S.B. 2808 ......................................................................... 16

Janice Y. Tsai et al., *Location-Sharing Technologies: Privacy Risks and
Controls*, Carnegie Mellon University (Feb. 2010) ...................... 14

Matthew Blaze, *Testimony before the U.S. House Subcommittee on Crime, Terrorism, Homeland Security, and Investigations* (Apr. 25, 2012) ................................................................................. 7

National Conference of State Legislatures, *Convicted Offenders Required to Submit DNA Samples* ....................................... 33

National Conference of State Legislatures, *DNA Arrestee Laws* .......... 33

News 21, *California's Growing Use of GPS* ........................................... 32

Pew Research Center, *Location-Based Services* (Sept. 12, 2013) ......... 13

Pew Research Center, *Privacy and Data Management on Mobile Devices* (Sept. 5, 2012) ............................................................. 13

Pew Research Center, *Public Perceptions of Privacy and Security in the Post-Snowden Era* (Nov. 12, 2014) ...................................... 12

Statement of Rep. Koch (April 22, 2014) ................................................ 16

Statement of Sen. Biss  (Feb. 19, 2014) ................................................. 16

Swift Navigation's Piksi ............................................................................ 7

Testimony of Rep. Hutton ....................................................................... 15

Testimony of Sen. Grothman (Dec. 19, 2013) ...................................... 15

*TRUSTe Study Reveals Smartphone Users More Concerned About Mobile Privacy Than Brand or Screen Size* (Sept. 5, 2013) .............. 13

U.S. Coast Guard, *NDGPS general information* .................................... 8

U.S. Federal Aviation Administration, *Satellite Navigation – GPS* ........................................................ 6, 8

U.S. Geological Survey, *USGS Global Positioning Application and Practice* ................................................................................. 7

# STATEMENT OF INTEREST[1]

The Electronic Frontier Foundation ("EFF") is a member-supported, non-profit civil liberties organization that has worked to protect free speech and privacy rights in the online and digital world for 25 years. With roughly 23,000 active donors and dues-paying members nationwide, EFF represents the interests of technology users in both court cases and broader policy debates surrounding the application of law in the digital age.

EFF has filed *amicus* briefs with this Court in numerous cases involving the application of constitutional principles to emerging technologies. *See, e.g., Backpage.com, LLC v. Dart*, —F.3d—, 2015 WL 7717221 (7th Cir. 2015); *McCarthy v. Langsenkamp Family Apostolate*, No. 15-1839 (7th Cir. 2015); *United States v. Daoud*, 755 F.3d 479 (7th Cir. 2014). EFF also has filed *amicus* briefs with the U.S. Supreme Court in numerous cases addressing Fourth Amendment protections. *See, e.g., City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015); *Riley v.*

---

[1] No party or party's counsel has authored this brief in whole or in part. No party, party's counsel, or other person has contributed money that was intended to fund preparing or submitting the brief. Plaintiff consents to the filing of this brief, and defendants take no position one way or the other.

*California*, 134 S. Ct. 2473 (2014); *Maryland v. King*, 133 S. Ct. 1958 (2013); *United States v. Jones*, 132 S. Ct. 945 (2012); *City of Ontario v. Quon*, 560 U.S. 746 (2010).

## ARGUMENT

When law enforcement officials use GPS devices and other emerging location surveillance technologies to systematically track *where* we are, they also learn an extraordinary amount of highly sensitive information about *who* we are. GPS tracking, especially when made possible by a device affixed to a person's body, allows the government to "reconstruct someone's specific movements down to the minute, not only around town but also within a particular building." *Riley v. California*, 134 S. Ct. 2473, 2490 (2014). This information creates a "precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *United States v. Jones*, 132 S. Ct. 945, 955 (2012) (Sotomayor, J., concurring). Such surveillance over time "intrudes upon an individual's reasonable expectation of privacy by revealing information about her daily trajectory and patterns that would, as a practical matter, remain private without the aid of

technology." *United States v. Cuevas-Perez*, 640 F.3d 272, 294 (7th Cir. 2011) (Wood, J., dissenting), *vacated*, 132 S. Ct. 1534 (2012).

Here, the State of Wisconsin has mandated that certain persons—including persons who have been completely discharged from their criminal sentences and are not on bail, probation, or parole—must wear a GPS ankle bracelet that subjects them to state-monitored, around the clock, real-time, highly precise tracking wherever they go. The law requires these individuals to wear the ankle bracelet for the rest of their lives. Every night, prison employees carefully review the location data collected over the previous 24 hours, which documents in detail each person's movements and whereabouts. The state stores this highly sensitive data forever, allowing it at any time in the future to go back and review where a person was at any given moment of her day in the past.

By allowing the state to monitor a person's movements minute-by-minute throughout each day for the rest of her life, the challenged GPS surveillance program severely and pervasively invades her privacy

interests.[2] These privacy interests sharply outweigh the government's stated interest in reducing recidivism and collecting information to aid in future criminal investigations. As such, the program constitutes an unconstitutional search under the Fourth Amendment. It is also a form of retroactive punishment under the Ex Post Facto Clause.

Because Wisconsin's surveillance program violates both the Fourth Amendment and the Ex Post Facto Clause of the Constitution, *amicus* urges this Court to uphold the district court's order granting plaintiff's Motion for Summary Judgment and denying the defendants' Motion.

## I. Wisconsin's GPS Tracking Program Constitutes an Unreasonable Search Under the Fourth Amendment

The Fourth Amendment prohibits unreasonable searches and seizures. When the government, as here, tracks a person's movement by attaching a GPS device to her body, the government conducts a search.

---

[2] The challenged program also burdens fundamental liberties in other ways. For example, it stigmatizes and humiliates its subjects, who can be observed wearing a tell-tale GPS ankle bracelet in public places. It also requires its subjects to tether themselves to an electric source to recharge the GPS device for one hour in every twenty-four hours. Further, it causes painful blisters and digs into plaintiff's leg. *See, e.g.,* Slip Op. at 7, 23-25, 39.

*Grady v. North Carolina*, 135 S. Ct. 1368, 1370 (2015) (per curiam).

Searches conducted without a warrant are *per se* unreasonable, subject

to only a few "jealously and carefully drawn" exceptions. *Coolidge v.*

*New Hampshire*, 403 U.S. 443, 454-55 (1971); *see also Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 219 (1973); *Arizona v. Gant*, 556 U.S. 332,

338 (2009) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).

The State argues that its program falls under one or more of these

limited exceptions, both because, under a totality of the circumstances

analysis, the state's interest in reducing recidivism outweighs plaintiff's

privacy interests and also because the program serves a "special need"

of the state to "(1) deter re-offense by a serious sex offender based on

that offender knowing that his location is being tracked and (2)

secondarily, [to] create a repository of information that may aid in

detecting or ruling out involvement in future sex offenses." App. Br. at

24-25.

In putting forth both of these arguments, Wisconsin sorely

undervalues the privacy interests of persons who, after fully serving

their sentences, have had their "liberty . . . restored" and who are

"legally presumed to be free." Slip Op. at 11.

**A. Wisconsin's GPS Surveillance Program—Which Imposes Highly Precise, Minute-by-Minute Location Tracking on All Registrants—Severely Burdens Privacy**

*1. GPS Tracking Devices are Highly Precise*

This case is not about (in defendants' words) merely "general" location tracking. App. Br. at 2, 18, 41. Rather, it is about a GPS surveillance system that allows the State of Wisconsin to create a highly precise record of a person's movements and whereabouts.

The Global Positioning System ("GPS") is operated by the U.S. Department of Defense. It consists of a constellation of GPS satellites orbiting the earth, and a network of ground stations used for monitoring and control. It provides accurate position information anywhere in the world.[3]

The GPS network can identify the physical location of a GPS device on the surface of the earth with remarkable accuracy. A leading scholar regarding security technology advised Congress that GPS accuracy is "typically within 10 meters."[4] The U.S. Federal Aviation

---

[3] U.S. Federal Aviation Administration, *Satellite Navigation – GPS, available at* https://www.faa.gov/about/office_org/headquarters_off ices/ato/service_units/techops/navservices/gnss/gps/.

[4] Matthew Blaze, *Testimony before the U.S. House Subcommittee on Crime, Terrorism, Homeland Security, and Investigations* (Apr. 25,

Administration studied GPS accuracy and concluded that 95% of GPS measurements have a horizontal error of less than 4 meters.[5] Likewise, the U.S. Geological Survey concluded that handheld commercial grade GPS devices are accurate within three to ten meters.[6] Some GPS devices now available for purchase are advertised as accurate within mere centimeters.[7]

Various earth-bound technologies augment the accuracy of the satellite-based GPS system. Assisted GPS ("AGPS") uses cellular and Wi-Fi networks to improve the accuracy and speed of GPS location tracking of cellular telephones.[8] Differential GPS ("DGPS"), operated by the U.S. Coast Guard's Navigation Center, uses remote broadcast sites to send correction signals, providing navigation accuracy that is

2012), *available at* 2013 WL 1771788; *see also* https://www.seas.upenn.edu/directory/profile.php?ID=8 (Prof. Blaze's webpage at Penn Engineering).

[5] FAA, *GPS Performance Analysis Report* (July 31, 2014) at 22, *available at* http://www.nstb.tc.faa.gov/reports/PAN86_0714.pdf.

[6] U.S. Geological Survey, *USGS Global Positioning Application and Practice*, *available at* http://water.usgs.gov/osw/gps/.

[7] *See, e.g.*, Swift Navigation's Piksi, *available at* www.swiftnav.com/piksi.html.

[8] *See, e.g., Assisted GPS: How Your Phone Knows Where It Is*, PC World (Oct. 16, 2012), *available at* http://www.pcworld.com/article/2011704/assisted-gps-how-your-phone-knows-where-it-is.html.

typically within one to three meters.[9] The Ground Based Augmentation System ("GBAS") and the Wide Area Augmentation System ("WAAS"), operated by the FAA, improve GPS accuracy for air travel.[10]

Here, the State of Wisconsin uses the aptly named "ExacuTrack One," an ankle-worn GPS device produced by BI Incorporated.[11] According to BI Incorporated, this device is the "ultimate GPS tracking system."[12] It relies on multiple technologies, including GPS and signals from nearby cell towers, "for optimal performance in various cellular coverage areas and conditions."[13] It can "collect location data as frequently as once every 15 seconds," and also can deliver that data in "near real-time" to the State.[14] In short, the device gives agencies "detailed information about a client's movement."[15]

---

[9] U.S. Coast Guard, *NDGPS general information, available at* http://www.navcen.uscg.gov/?pageName=dgpsMain.

[10] U.S. Federal Aviation Administration, *Satellite Navigation, available at* https://www.faa.gov/about/office_org/headquarters_offices/a to/service_units/techops/navservices/gnss/.

[11] Plaintiff's Statement of Facts (Dist. Ct. Dkt. #69) at par. 16.

[12] *Available at* http://bi.com/exacutrack-one/.

[13] *Available at* http://bi.com/wp-content/uploads/pdfs/brochures/exacutrack-one.pdf.

[14] *Id.*

[15] *Id.*

>           *2.    The Implementation of Wisconsin's Program Increases*
>                  *its Impact on Privacy*

The Wisconsin Department of Correction's GPS Monitoring

Center, in real time, tracks and records the movements and locations of

all people involved in the challenged program. *See* Joint Stipulations

(Dist. Ct. Dkt. #68) at pars. 2-3, 24. It records a location point every

minute. *Id.* at par. 5. The raw data is stored forever in a contractor's

server. *Id.* at par. 14.

Every night, a DOC employee monitors the movements of each

registrant in the previous 24 hours. *Id.* at par. 3. They do so with a Bing

computer map using Total Access software. *Id.* The monitor begins their

review with an overview, consisting of a static map showing all

locations that day for a particular registrant. *Id.* at par. 4. They can

refine their analysis by narrowing the display to a particular time or

place. *Id.* The monitor can also view the registrant's location moving

across the map. *Id.* They can identify the registrant's location, speed,

bearing, and surroundings. *Id.* at par. 14. The monitor can review the

registrant's movements not just in the past 24 hours, but at all times

since the registrant was subjected to GPS tracking. *Id.*

Every night, the DOC monitors fill out a form regarding each

registrant's movements. *Id.* at par. 15. The monitors document when registrants have gone near a park, playground, school, daycare, hospital, library, sports venue, movie theater, golf course, department store, pharmacy, bar, restaurant, church, or shopping mall. *Id.* at par. 16. The monitors also document when registrants have not spent any time, or did not spend the night, in their "home zone." *Id.* Regarding plaintiff in particular, the monitors documented when he stayed home all day, when he stayed away from home all day, when he went near a church or health center or school, and when he was at a park or library or storage facility. *Id.* at par. 17.

In short, the challenged GPS location surveillance program is a "prison without walls," in the words of an article approvingly republished on the website of BI Incorporated, the manufacturer of the surveillance tools used here.[16]

---

[16] *See* Plaintiff's Statement of Facts (Dist. Ct. Dkt. #69) at par. 19. *See also* http://bi.com/prison-without-walls/.

### B.  The Privacy Interests of Persons Who Have Fully Served Their Sentences Sharply Outweigh the State's Interest in Preventing Recidivism

#### 1.  The Fourth Amendment Protects Location Privacy

Where we go exposes who we are. People take "indisputably private" trips, including "to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on." *Jones*, 132 S. Ct. at 955 (Sotomayor, J., concurring) (quoting *People v. Weaver*, 909 N.E.2d 1195, 11993 (N.Y. 2009)). These private trips can reveal a great deal about a person. As the District of Columbia Circuit explained, "[a] person who knows all of another's travels can deduce whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband, an outpatient receiving medical treatment, an associate of particular individuals or political groups—and not just one such fact about a person, but all such facts." *United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010), *aff'd*, *Jones*, 132 S. Ct. 945.

"[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *See Kyllo v. United States*, 533 U.S. 27, 33 (2001) (citing

11

*Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

Numerous opinion studies, and recent advances in state law,

demonstrate both that Americans have a subjective expectation of

privacy in their location information and that a growing portion of

society recognizes this expectation as reasonable.

> 2.     *Research Shows Americans Have a Subjective*
>        *Expectation of Privacy in Their Location Information*

For the Fourth Amendment to apply, a person must "exhibit[] an

actual expectation of privacy." *Bond v. United States*, 529 U.S. 334, 338

(2000). Recent studies show that the American public overwhelmingly

expects privacy when it comes to location information. In 2014, the Pew

Research Center found that 82% of Americans consider the details of

their physical location over time to be sensitive information, including

50% of Americans who consider it to be "very sensitive." This exceeds

the percentage of Americans who consider other information to be

sensitive, including the content of their text messages (75%),

relationship history (71%), political views (51%), or religious views

(45%).[17]

---

[17] Pew Research Center, *Public Perceptions of Privacy and
Security in the Post-Snowden Era* (Nov. 12, 2014), at 34, 36-37,

Two earlier Pew Research Center reports (in 2012 and 2013) found that cell phone owners take many steps to protect the privacy of their personal information and mobile data. Overall, 57% of cell phone owners uninstalled, or decided to not install, an app due to concerns about privacy.[18] Most significantly here, 19% of cell phone owners turned off the location-tracking feature on their cell phones because they were concerned that other people or organizations might access that information.[19] Teenagers undertook such location privacy self-defense at a much higher rate—46%.[20]

Other studies back this up. A 2013 study conducted by Harris Interactive on behalf of a data privacy company found that 69% of American smart phone users did not like the idea of being tracked.[21]

---

available at http://www.pewinternet.org/files/2014/11/PI_PublicPerceptionsofPrivacy_111214.pdf.

[18] Pew Research Center, *Privacy and Data Management on Mobile Devices* (Sept. 5, 2012), at 2, *available at* http://www.pewinternet.org/2012/09/05/privacy-and-data-management-on-mobile-devices/.

[19] *Id.*

[20] Pew Research Center, *Location-Based Services* (Sept. 12, 2013), at 3, *available at* http://www.pewinternet.org/2013/09/12/location-based-services/.

[21] *TRUSTe Study Reveals Smartphone Users More Concerned About Mobile Privacy Than Brand or Screen Size* (Sept. 5, 2013), *available at* http://www.truste.com/blog/2013/09/05/truste-study-

And a 2009 Carnegie Mellon University study of perceptions about location-sharing technologies found that participants were "extremely concerned" about controlling access to their location information. Participants believed the risks of location-sharing technologies outweighed the benefits.[22]

As these studies demonstrate, the vast majority of the American public highly values location privacy.

### 3. A Growing Number of States Protect Location Information by Statute

Given the broad national consensus among the American public that a person's physical movements and whereabouts are private, it is no surprise that a growing number of states—including all three of the states within this Court's jurisdiction—now protect privacy in location information through state law. Such statutes are one way to show that members of the public have a reasonable expectation of privacy in their location information. *See, e.g.*, *Maynard*, 615 F.3d at 564 ("state laws

_____

reveals-smartphone-users-more-concerned-about-mobile-privacy-than-brand-or-screen-size/.

[22] Janice Y. Tsai et al., *Location-Sharing Technologies: Privacy Risks and Controls*, Carnegie Mellon University (Feb. 2010), at 1, 11-13, *available at* http://cups.cs.cmu.edu/LBSprivacy/files/TsaiKelleyCranorS adeh_2009.pdf.

are indicative that prolonged GPS monitoring defeats an expectation of privacy that our society recognizes as reasonable"); *United States v. Cooper*, 2015 WL 881578, *8 (N.D. Cal. 2015) (protecting location privacy because, among other reasons, "the recognition of a privacy right by numerous states may provide insight into broad societal expectations of privacy").

Within the Seventh Circuit, Wisconsin, Indiana, and Illinois have all chosen to protect location information by requiring police to get a warrant to conduct real-time cell phone location tracking.[23] In advocating for Wisconsin's law, Senator Glenn Grothman, a co-sponsor of the bill, recognized the need to protect "individual privacy rights during police investigations" and recommended that Wisconsin "be among the states leading the nation in addressing these important issues of privacy."[24] Senator Daniel Biss, lead sponsor of Illinois' law, which had unanimous support in both chambers of the legislature,

---

[23] *See* 725 Ill. Comp. Stat. Ann. 168/10; Ind. Code Ann. § 35-33-5-12; Wis. Stat. Ann. § 968.373(2).

[24] Testimony of Sen. Grothman (Dec. 19, 2013), *available at* http://lc.legis.wisconsin.gov/comtmats2013/ab0536.pdf. *See also* Testimony of Rep. Hutton (stating the law was needed to "provide appropriate privacy protections for law abiding citizens"), *available at* same link.

recognized that location information "can reveal a surprising amount of detailed information most of us believe should stay private," and stated that "a free society needs to put strict limits on the government's collection of information about citizens' private lives."[25] After Indiana Governor Mike Pence signed that state's bill into law, the bill's author, Representative Eric Koch, stated: "[w]ith technology continuing to evolve faster than the law, it was crucial to take steps to give all Hoosiers the peace of mind that common and reasonable expectations of privacy are still guaranteed in Indiana."[26]

At least three other states—Maryland, Virginia, and Washington—also require police to get a warrant to conduct real-time cell phone location tracking.[27]

---

[25] Statement of Sen. Biss  (Feb. 19, 2014), *available at* http://senatorbiss.com/component/content/article?id=82:biss-qmore-green-lightsq. *See also* legislative history of S.B. 2808, *available at* http://ilga.gov/legislation/BillStatus.asp?DocNum=2808&GAID=12&Doc TypeID=SB&LegId=78729&SessionID=85&GA=98.

[26] Statement of Rep. Koch (April 22, 2014), *available at* http://www.indianahouserepublicans.com/news/press-releases/r65-rep.-koch-s-privacy-bill-signed-into-law-4-22-2014/.

[27] Md. Code, Criminal Procedure 1-203.1(b)(1); Va. Code Ann. 19.2-56.2(b); Wash. Rev. Code 9.73.260.

State legislatures in other jurisdictions have enacted additional statutory protections for location information:

- At least eight states require police to get a warrant to obtain any cell site location information from telephone companies.[28]
- At least seven states require police to get a warrant to install an electronic tracking device.[29]
- At least seven states prohibit anyone, besides police, from using an electronic tracking device to monitor the movement of another person or their vehicle.[30]

The prevalence of state laws protecting location information shows that society accepts as reasonable a privacy interest in this information.

### 4.  Courts Recognize the Privacy Implications of Location Information

Courts around the country have also recognized the privacy implications of location information. In 2012, a majority of the Justices

---

[28] *See* Cal. Penal Code Ann. § 1546; Colo. Rev. Stat. Ann. § 16-3-303.5; 16 Maine Rev. Stat. Ann. § 648; Minn. Stat. Ann. §§ 626A.28(3)(d), 626A.42(1)(d); Mont. Code Ann. § 46-5-110(1)(a); N.H. Stat. Ann. § 644-A; Tenn. Code Ann. § 39-13-610(b); Utah Code Ann. § 77-23c-102(1)(a).

[29] *See* Fla. Stat. Ann. § 934.42; Haw. Rev. Stat. § 803-44.7(b); Iowa Code Ann. § 808.4; Okla. Stat. Ann. Title 13, § 177.6(A); Or. Rev. Stat. Ann. § 133.619(6); 18 Pa. Stat. Ann. § 5761(c)(4); S.C. Code Ann. § 17-30-140(B)(2).

[30] *See* Cal. Penal Code § 637.7; Del. Code Ann. § 1335(a)(8); Haw. Rev. Stat. § 803-42(a)(8); Minn. Stat. Ann. § 626A.35; Tenn. Code Ann. § 39-13-606; Tex. Penal Code Ann. § 16.06; Va. Code § 18.2-60.5.

of the Supreme Court opined in *United States v. Jones* that people
expect their otherwise public movements on the street to remain
private. 132 S. Ct. 945 (2012). Although the Court ultimately held that
placing a GPS tracking device on a car was a "search" because it was a
physical trespass onto private property, *id*. at 949, in two separate
concurring opinions, five members of the Court recognized that long-
term GPS location tracking "impinges on expectations of privacy." *Id*. at
955 (Sotomayor, J., concurring); *id*. at 964 (Alito, J., concurring in the
judgment). The other four Justices did not dispute this conclusion; they
simply did not address it. *Id*. at 953-54. In concluding that extended
GPS tracking invades a person's reasonable expectation of privacy,
Justice Sotomayor questioned "whether people reasonably expect that
their movements will be recorded and aggregated in a manner that
enables the Government to ascertain . . . their political and religious
beliefs, sexual habits, and so on." *Id*. at 956 (Sotomayor, J., concurring).
Likewise, Justice Alito wrote on behalf of himself and three other
Justices that "society's expectation has been that law enforcement
agents and others would not . . . secretly monitor and catalogue every
single movement of an individual's car for a very long period." *Id*. at 964

(Alito, J., concurring in the judgment).

Following *Jones*, in 2014 the Supreme Court specifically cited location privacy as a reason to limit police searches of cell phones incident to arrest. *Riley*, 134 S. Ct. at 2490. The Court noted that cell phones store data that can "reveal where a person has been," making it possible to "reconstruct someone's specific movements down to the minute, not only around town but also within a particular building." *Id.* (citing *Jones*, 132 S. Ct. at 955 (Sotomayor, J., concurring)).

In the wake of *Jones*, many other courts have also recognized the privacy implications of location information, most commonly in cell site location information ("CSLI") generated by a mobile phone. In *Commonwealth v. Augustine*, the Massachusetts Supreme Judicial Court held that CSLI may raise even greater privacy concerns than a GPS tracking device placed on a car because cell site data can track "the user's location far beyond the limitations of where a car can travel"— including into "constitutionally protected areas" like a home. 4 N.E.3d 846, 861-62 (Mass. 2014). The same is true of GPS tracking devices attached to a person. *Augustine* also noted that historical location data gives police access to something they would never have with traditional

law enforcement investigative methods: the ability "to track and reconstruct a person's past movements." *Id.* at 865.

Likewise, in *State v. Earls*, the New Jersey Supreme Court distinguished CSLI from the data generated by older, less sensitive tracking devices like beepers. 70 A. 3d 630 (N.J. 2013). *Earls* held that CSLI blurs "the historical distinction between public and private areas . . . [and thus] does more than simply augment visual surveillance in public areas." *Id.* at 642-43 (citing *United States v. Knotts,* 460 U.S. 276, 282 (1983)); *see also Tracey v. State,* 152 So.3d 504, 522, 524-26 (Fla. 2014) (distinguishing real-time CSLI from the *Knotts* beeper data and holding the Fourth Amendment requires a warrant for CSLI).

Indeed, numerous federal and state courts have held that the Fourth Amendment requires law enforcement to obtain a warrant to access historical CSLI[31] or to conduct real-time location tracking.[32] Also,

---

[31] *See, e.g., United States v. Graham*, 796 F.3d 332, 360 (4th Cir. 2015), *rehearing en banc granted*, 2015 WL 6531272 (2015); *In re Application for Tel. Info.*, 2015 WL 4594558, \*12 (N.D. Cal. 2015), *appeal filed*, No. 15-16760 (9th Cir. 2015); *United States v. Cooper*, 2015 WL 881578, \*8 (N.D. Cal. 2015); *but see United States v. Davis*, 785 F.3d 498, 518 (11th Cir. 2015) (en banc), *cert. denied*, 2015 WL 4600402 (2015); *In re Application for Cell Site Data*, 724 F.3d 600 (5th Cir. 2013).

[32] *See, e.g., United States v. White*, 62 F. Supp. 3d 614, 622-23 (E.D. Mich. 2014); *United States v. Powell*, 943 F. Supp. 2d 759, 776-79

many state courts have interpreted their state constitutions to require

police to get a warrant or other court order to obtain phone records,[33]

which would include records about a subscriber's location.

> 5.     *The Challenged GPS Program is More Onerous Than Other Forms of Location Monitoring Previously Addressed by the Courts*

Wisconsin's GPS surveillance program is more invasive of location

privacy than the GPS tracking of a car at issue in *United States v. Jones*

or the location tracking possible through CSLI or GPS data generated

by a mobile phone.

Without question, GPS devices can identify physical movements

and whereabouts with an extraordinarily high level of precision. But

---

(E.D. Mich. 2013); *see also Commonwealth v. Rushing*, 71 A.3d 939, 961-64 (Pa. Super. Ct. 2013) (so holding under the Pennsylvania Constitution), *rev'd on other grounds* 99 A.3d 416 (Pa. Sup. Ct. 2014); *In re application relating to target phone*, 733 F. Supp. 2d 939 (N.D. Ill. 2009) (so holding under federal statutes).

[33] *See, e.g., People v. Blair*, 602 P.2d 738, 746 (Cal. 1979); *People v. Sporleder*, 666 P.2d 135, 141-43 (Colo. 1983); *Shaktman v. State*, 553 So.2d 148 (Fla. 1989); *State v. Rothman*, 779 P.2d 1, 7-8 (Haw. 1989); *State v. Thompson*, 760 P.2d 1162, 1165-67 (Idaho 1988); *State v. Hunt*, 450 A.2d 952, 955-57 (N.J. 1982); *Commonwealth v. Melilli*, 555 A.2d 1254, 1256-59 (Pa. 1989); *State v. Gunwall*, 720 P.2d 808, 813-17 (Wash. 1986). *See also Ellis v. State*, 353 S.E.2 19 (Ga. 1987) (interpreting state statute to require warrant to obtain phone records).

the GPS surveillance program at issue here is not limited to where a car can go—the tracking device is attached to a person's body. People routinely move about without their own car, for example by walking, riding on public transportation, or traveling in someone else's car. Perhaps most importantly, GPS devices attached to people, unlike those attached to cars, will enter highly sensitive areas, like the home, that enjoy heightened constitutional protection. Absent a warrant, the Fourth Amendment forbids government from remotely monitoring the interior of a home by using tools, new or old, that exceed the power of human senses. *See, e.g., Florida v. Jardines*, 133 S. Ct. 1409 (2013) (drug-sniffing dogs); *Kyllo v. United States*, 533 U.S. 27 (2001) (thermal imagers); *United States v. Karo*, 468 U.S. 705 (1984) (early-model location-tracking "beepers").

The tracking possible through Wisconsin's program is also more precise and invasive than CSLI or even GPS data generated by a cell phone. As the Supreme Court recognized in *Riley*, "[h]istoric location information" generated by a cell phone allows the government to "reconstruct someone's specific movements down to the minute, not only around town but also within a particular building." 134 S.Ct. at 2490.

However, unlike a cell phone, which a person could choose not to carry with them, the ankle bracelet cannot be removed. Further, because the surveillance is around the clock for the rest of a person's life, it allows the government to create a more detailed and intimate portrait of a person's life than any other technology or program the courts have considered in previous cases.

The severe burden that Wisconsin's suspicionless search program places on registrants' privacy interests is not outweighed by any corresponding benefit to the government. As such, it violates the Fourth Amendment.

## C. Wisconsin's Program is Not Justified by a "Special Need" Beyond the Ordinary Needs of Law Enforcement

Wisconsin's program also fails to meet the requirements for a warrantless, suspicionless search under the "special needs" doctrine. To show that the program serves a "special need," the state must demonstrate both that (1) the program advances a special need beyond the ordinary needs of law enforcement, and (2) the program's advancement of government interests outweighs the resulting burden on individual privacy. *See, e.g., Chandler v. Miller*, 520 U.S. 305, 313

(1997); *see also Grady*, 135 S. Ct. at 1371 (citing *Vernonia Sch. v. Acton*, 515 U.S. 646 (1995)).

Wisconsin's program fails on both accounts. First, as demonstrated above, the program sharply impacts the privacy interests of the person burdened with wearing the GPS tracking device. Wisconsin has failed to show that its interest in reducing recidivism outweighs that privacy interest. Second, Wisconsin has failed to show the program meets a need outside of ordinary law enforcement.

The two stated purposes of the program are to prevent future crime and to aid investigations should a future crime occur. *See* App. Br. at 24-35 (program is designed to "deter re-offense" and to "create a repository of information that may aid in detecting or ruling out involvement in future sex offenses"). These purposes are very different from those in cases where the Supreme Court has found that a "special need" justifies a suspicionless search. *See, e.g.*, *Vernonia*, 515 U.S. at 650 (purpose of high school athlete drug testing program was to "prevent student athletes from using drugs, to protect their health and safety, and to provide drug users with assistance programs"); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 661 (1989) (purpose

of drug testing of Customs agents was to protect the safety of the public
and prevent compromise of the agency by ensuring those who handle
firearms or "classified" material are drug free); *Camara v. Municipal
Court of San Francisco*, 387 U.S. 523, 534-39 (1967) (purpose of
administrative inspection was protect public safety by ensuring
compliance with city housing code). At bottom, the purpose of the
Wisconsin program is merely "to uncover evidence of ordinary criminal
wrongdoing" and "to advance the 'general interest in crime control.'" *See
City of Indianapolis v. Edmond*, 531 U.S. 32, 42, 44 (2000) (citing
*Delaware v. Prouse*, 440 U.S. 648, 659, n. 18 (1979)).[34]

For these reasons, the challenged program cannot satisfy the
special needs doctrine and accordingly violates the Fourth Amendment.
*Accord* Slip Op. at 39.

---

[34] Moreover, the subjects of the challenged program, who have
been completely discharged from their criminal sentences, have no
diminished expectation of privacy, unlike the school children in
*Vernonia. See* Slip Op. at 38-39; *cf Vernonia*, 515 U.S. at 657 ("school
athletes have a reduced expectation of privacy"). In this regard, the
subjects of the challenged program are also unlike people on probation
or parole, who despite no longer being in jail or prison have not yet been
discharged from their criminal sentences. *Cf. Samson v. California*, 547
U.S. 843 (2006) (allowing no-suspicion searches of parolees).

## II.  GPS Surveillance Also Burdens Speech and Association

Continuous, permanent GPS surveillance of a person's location and movement burdens not only their Fourth Amendment right to privacy; it also burdens their First Amendment rights to free speech and association. As Justice Sotomayor explained in her concurring opinion in *Jones*: "Awareness that the Government may be watching chills associational and expressive freedoms." 132 S. Ct. at 956. Indeed, plaintiff's knowledge that he is under constant GPS surveillance has deterred him from visiting his church and lawyers. *See* Plaintiff's Statement of Facts (Dist. Ct. Dkt. #69) at pars. 35-36. This chill further implicates religious liberty and the right of access to the courts.

The Supreme Court has addressed the overlapping interests in privacy and freedom of speech and association. For example, the First Amendment's guaranty of freedom to associate necessarily includes the freedom to do so privately. *See, e.g., NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (protecting an advocacy group's membership list); *Brown v. Socialist Workers*, 459 U.S. 87, 101-02 (1982) (protecting an advocacy group's donor list). The Court explained: "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group

espouses dissident beliefs." *NAACP*, 357 U.S. at 462. *See also Brown*, 459 U.S. at 91 ("Such disclosures can seriously infringe on privacy of association and belief guaranteed by the First Amendment.").

People subjected to permanent, around the clock, real-time, highly accurate location surveillance cannot associate with any organization or other people without the government knowing about it. This lack of privacy will inevitably deter and prevent expressive association. *See generally Jones*, 132 S. Ct. at 956 (Sotomayor, J., concurring) (warning that GPS surveillance might "alter the relationship between citizen and government in a way that is inimical to democratic society") (quoting *Cuevas-Perez*, 640 F.3d at 285 (Flaum, J., concurring)).

The challenged GPS surveillance program also burdens the constitutional right to intimate association. *See, e.g., Roberts v. Jaycees*, 468 U.S. 609, 617-18 (1984) ("choices to enter and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme"). This right limits government intrusions into family relationships and other intimate relationships with comparable size and selectivity. *Id.* at

619-20.

Here, the challenged program has deterred plaintiff from visiting his family, friends, and doctor. *See* Plaintiff's Statement of Facts (Dist. Ct. Dkt. #69) at pars. 35-36. Many reasonable people would make the same choice—*i.e.*, to forego contact with close family and friends to avoid subjecting them to government scrutiny. This is especially true where, as here, the government's gaze necessarily falls upon those who choose to associate with one of the most unpopular segments of our society. Plaintiff should not be required to forego his right to intimate association in order to protect his family and friends from collateral government scrutiny.

## III.   Wisconsin's Surveillance Program Constitutes Retroactive Punishment and Thus Violates the Ex Post Facto Clause

The Ex Post Facto Clause forbids the government from enacting laws that impose additional punishments for acts that were not punishable in that way at the time they were committed. *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981). Laws that retroactively burden sex offenders violate the Ex Post Facto Clause if their purpose or effect is punitive. *Smith v. Doe*, 538 U.S. 84, 92 (2003). Useful guideposts in evaluating whether there is an impermissibly punitive effect include

whether the law: "[1] has been regarded in our history and traditions as a punishment; [2] imposes an affirmative disability or restraint; [3] promotes the traditional aims of punishment; [4] has a rational connection to a non-punitive purpose; or [5] is excessive with respect to this purpose." *Id.* at 97.

Applying these guideposts, courts have found a punitive effect, and thus an Ex Post Facto Clause violation, from government programs, like the one here, that retroactively subject sex offenders to lifetime GPS surveillance. *See Riley v. New Jersey Parole Bd.*, 98 A.3d 544 (N.J. 2014); *Commonwealth v. Cory*, 911 N.E.2d 187 (Mass. 2009); *see also State v. Dykes*, 744 S.E.2d 505, 509 (S.C. 2013) (striking down lifetime GPS monitoring of sex offenders, on due process grounds, absent an opportunity for subsequent judicial review of ongoing dangerousness). In finding a punitive effect, these courts emphasized the invasion of location privacy. *Cory*, 911 N.E.2d at 196 (decrying the "continuous surveillance" and "continuous reporting of the offender's location to the probation department"); *Dykes*, 744 S.E.2d at 509 ("lifetime imposition of satellite monitoring implicates a protected liberty interest to be free from permanent, unwarranted government

interference"); *see also State v. Bowditch*, 700 S.E.2d 1, 16 (N.C. 2010) (Hudson, J., dissenting) (arguing that lifetime GPS monitoring of sex offenders has a punitive effect because, inter alia, government is "at all times capable of determining [their] geographical location").[35]

Indeed, as set forth in detail above, the challenged program imposes a severe and pervasive burden on location privacy and on freedom of association. The program comprises an "affirmative disability or restraint," and this kind of program is "regarded in our history and traditions as punitive." *Smith*, 538 U.S. at 97. Accordingly, the challenged program has a punitive effect, and its retroactive application to plaintiff and those similarly situated violates the Ex Post Facto Clause.

## IV.  Fourth Amendment Guarantees Must be Maintained as New Technologies Make New Surveillance Possible

The State of Wisconsin has determined that plaintiff has served his time. He is a maximum discharge registrant who is not currently under any criminal justice supervision, such as parole, extended

_____

[35] The facts here are distinct from those in *Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007), which upheld GPS monitoring of sex offenders while on probation. *See Riley*, 98 A.3d at 556 (making this distinction).

supervision, or supervised release. *See* Joint Stipulations (Dist. Ct. Dkt. #68) at pars. 2-3, 24. As a free person, he is no longer under the authority of the Department of Corrections. Slip Op. at 8. He is not even subject to restrictions on where he can and cannot go. *Id.* As the district court noted, "[t]o hold that the State may use [lifetime location tracking technology] to restrain the liberty of individuals it believes to be dangerous, not as a punishment for a crime or as part of the care and treatment of the dangerous mentally ill, but as a civil regulatory scheme for the protection of the public, would significantly expand the power of the state." *Id.* at 43. It would also create a dangerous precedent that the state may restrain the liberty of others it considers to be undesirable, whether or not they are former sex offenders.

GPS technology is rapidly becoming less expensive. Given the economic laws of supply and demand, the reduced cost of GPS technology has lead to increased law enforcement demand to use it as a surveillance tool. As Justice Alito explained in his opinion concurring in the judgment in *Jones*:

> In the pre-computer age, the greatest protections of privacy
> were neither constitutional nor statutory, but practical.
> Traditional surveillance for any extended period of time was
> difficult and costly and therefore rarely undertaken. The

> surveillance at issue in this case—constant monitoring of the location of a vehicle for four weeks—would have required a large team of agents, multiple vehicles, and perhaps aerial assistance. Only an investigation of unusual importance could have justified such an expenditure of law enforcement resources. Devices like the one used in the present case, however, make long-term monitoring relatively easy and cheap.

*Jones*, 132 S. Ct. at 963-64 (Alito, J., concurring in the judgment).

Indeed, police are using GPS technology to track the movements of an ever-growing number of court-involved people, for varying offenses and at varying stages of the criminal justice process. Most states now track people who have committed sex offenses.[36] GPS surveillance is also used with certain court-involved juveniles at risk of escalating violence,[37] gang members subject to gang injunctions,[38] and domestic abusers.[39]

---

[36] *See* Eric Dante, *Tracking the Constitution: The Proliferation and Legality of Sex-offender GPS-tracking Statutes*, 42 Seton Hall L. Rev. 1169, 1172-1190 (2012) (identifying 41 states).

[37] *See, e.g.*, Governor's Office of Crime Control and Prevention, *Maryland's Comprehensive State Crime Control and Prevention Plan* (2013) at 23, *available* at http://www.iir.com/bja-state-fact-sheets/PDF/Strategies/MD-Strategic-Plan.pdf.

[38] *See, e.g.,* News 21, *California's Growing Use of GPS*, *available at* http://berkeley.news21.com/behindbars/parole/tracked/.

[39] *See, e.g.,* Wis. Stat. Ann. § 813.129; *see generally* Domestic Shelters, *Using GPS To Track Batterers* (July 15, 2015) (reporting that 23 states do so), *available at* https://www.domesticshelters.org/domestic-violence-articles-information/using-gps-to-track-batterers; Ariana Green, *More States Use GPS To Track Abusers*, N.Y. Times (May 8,

Many new police surveillance tools at first are applied only to the "worst of the worst," and then are expanded to cover far more people who are far less culpable. For example, DNA was once collected only from people convicted of the most violent offenses, but now in many states it is collected from people, including juveniles, merely arrested for a much broader range of offenses.[40]

The Fourth Amendment must limit the government's inevitable tendency to attempt to subject an ever-growing number of people to GPS location surveillance. At a minimum, the Fourth Amendment should not allow the government to impose GPS surveillance—around the clock and for life—upon people like plaintiff who have been

---

2009) (reporting that 13 states did so), *available at* http://www.nytimes.com/2009/05/09/us/09gps.html?_r=0.

[40] *See*, *e.g.*, *Rise v. Oregon*, 59 F.3d 1556, 1558 (9th Cir. 1995) (noting that in 1995, Oregon's DNA collection law only applied to "persons convicted of murder, a sexual offense, or conspiracy or attempt to commit a sexual offense"); National Conference of State Legislatures, *Convicted Offenders Required to Submit DNA Samples* (noting "New York, for example, has expanded the crimes for which they collect DNA five times since they began using the technology in 1994"), *available at* http://www.ncsl.org/Documents/cj/ConvictedOffendersDNALaws.pdf; National Conference of State Legislatures, *DNA Arrestee Laws* (noting that 30 states collect DNA from specified arrestees, in some states for all felonies and some misdemeanors, and in some states from juveniles), *available at* http://www.ncsl.org/Documents/cj/ArresteeDNALaws.pdf.

completely discharged from their criminal sentences.

## CONCLUSION

For the foregoing reasons, *amicus curiae* Electronic Frontier Foundation respectfully requests that this Court affirm the district court's grant of summary judgment to plaintiff and its denial of summary judgment to defendants.

Dated: December 18, 2015

By: /s/ Adam Schwartz

Adam Schwartz
Jennifer Lynch
Jamie Lee Williams
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109

Counsel for *Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.     This Brief Amicus Curie of Electronic Frontier Foundation complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,657 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 2011 in 14-point Century Schoolbook.

Dated: December 18, 2015          By: /s/ Adam Schwartz
                                            Adam Schwartz

                                            *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 18, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 18, 2015          By: /s/ Adam Schwartz
                                           Adam Schwartz

                                      *Counsel for Amicus Curiae*